## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JANE DOE 7, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:16-cv-2458-JTM-GLR |
| | ) | |
| THE UNIVERSITY OF KANSAS, | ) | |
| | ) | |
| Defendant. | ) | |

## THIRD AMENDED COMPLAINT

1.     Plaintiff Jane Doe 7, Sarah McClure, brings this suit to seek compensation and redress for harms she suffered as a result of a hostile educational environment created by the Defendant University of Kansas in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). Plaintiff also brings this suit to seek compensation and redress for harms she suffered as a result of disability discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq.

2.     This court has jurisdiction over Plaintiff's Title IX claims and Rehabilitation Act claims. A Kansas District Court is a court of general jurisdiction. *Undrey Engine & Pump Co. V. Eufaula Enterprises ,Inc.*, 22 6 Kan. 186, 190, 597 P.2d 246 (1979). State courts have "inherent authority, and are thus presumptively competent, to adjudicate claim arising under the laws of the United States." *Yellow Freight Systems, Inc. v. Donnelly*, 494 U.S. 820, 823 (1990).

3.     Plaintiff Jane Doe 7 is a female student and athlete who at all relevant times was and remains a student, resident and athlete at the University of Kansas.

4.     At all material times, the University of Kansas ("KU") was a Kansas educational institution located in Douglas County, Kansas, and the recipient of federal grant funds and financial assistance.

5.     John Doe G was at all times relevant a KU student, a resident of the KU dormitory known as the Jayhawker Towers, and a KU football team member, until his expulsion from KU in early 2016.

6.     Title IX, 20 U.S.C. § 1681(a) states:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance.

7.     A school that receives federal funds violates Title IX and is subject to a private action for damages where the school is "deliberately indifferent" to known acts of discrimination against students. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988).

8.     The protections of Title IX extend to situations where the school is deliberately indifferent to the sexual harassment of a student by another student. *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999).

9.     KU is responsible for enforcing these policies and ensuring that its employees are adequately trained to follow these policies.

10.    KU's employees were operating within the scope of their employment at all time relevant with regard to the events described herein.

2

11.    KU owns and manages student dormitories, including apartments commonly known as the Jayhawker Towers, which has a specific history of publicly reported sexual assaults of women, including but not limited to such recent events as:

a. In March of 2013, the KU public safety office investigated a report of a sexual assault of a female at Jayhawker Towers Apartments.

b. In October 2013, KU received a report of a rape a female KU residence hall resident by a KU student.

c. In April of 2014, a KU female residence hall student reported a rape at her residence hall.

d. In October of 2014, two female KU residence hall students reported sexual assaults at their residence hall by a KU student and another man.

e. In March of 2014, a KU football player was arrested after a 19-year-old KU student reported that she had been fondled while passed out in the parking lot of the Jayhawker Towers, where the football player was a resident.

f. On November 10, 2014, the KU public safety office received a report of an alleged sexual battery at the Jayhawker Towers.

g. In the Fall of 2014, John Doe G sexually assaulted a KU student at his apartment at the Jayhawker Towers.

h. In February of 2016, a KU football player was arrested held on suspicion of sexual battery and criminal restraint stemming from conduct at the Jayhawker Towers.

12. KU officials stated that for every reported assault, there are another eight assaults that go unreported.

13. KU's police chief for 38 years said in January of 2016 that in recent years a sharp increase of reported sexual assaults at KU has occurred, and that sexual assaults remained the biggest issue for the campus.

14. According to the 2015 Clery Report for KU, in 2014 there were 14 rapes and 10 fondlings reported on campus, with 10 of the rapes and six of the fondlings occurring in KU's dorms – more than any other Big 12 university except the University of Texas, a much larger institution. In 2013 there were 13 forcible sex offenses reported, with 9 of them occurring in KU's dorms. In 2012, there were only 3 forcible sex offenses reported, with two in KU's dorms.

15. None of KU's sexual assault reporting, however, appeared in its residential advertisements.

16. In the Fall of 2014, John Doe G sexually assaulted a female KU student, Daisy Tackett, and member of the school's rowing team at the Jayhawker Towers.

17. In 2014-2015, KU made representations online on the institution's website that KU and its residence halls were a "safe community" and that "Security is a priority."

18.    In 2014-2015, KU actively recruited Plaintiff to be a member of the rowing team as a coxswain, and Plaintiff enrolled at KU in the Fall of 2015 as a scholarship member of the school's rowing team.

19.    Plaintiff is a qualified student with a disability. During her recruitment at KU, she fully informed the coaching staff and Athletic Department that she had a serious medical condition and of her dietary needs to maintain her health.

20.    As part of her scholarship and to meet her dietary restrictions and nutritional needs, Plaintiff was provided a residence in Jayhawker Towers as an accommodation so she could prepare her own food.

21.    Because of her disability, Plaintiff was not able to use the KU meal plan offered to scholarship athletes.

22.    Despite actual knowledge of Plaintiff's disability, KU's rowing team recruited her to the team and at no time made her completion of high-impact workouts a condition for participating on the team – a coxswain is a position that does not require high-impact physical performance, as the coxswain serves to steer the boat, strategize and motivate the boat's rowers.

23.    In August 2015, Plaintiff met John Doe G through a mutual friend who was also on the football team.

24.    On August 29, 2015, John Doe G sexually assaulted her in her room in Jayhawker Towers.

25.     Plaintiff confided in a friend about what occurred and chose not to immediately report the sexual assault at the time.

26.     Plaintiff participated in a regatta on October 18, 2015 and her boat placed second.

27.     On October 19, 2015, Plaintiff met with the team's sport psychologist, Sherice Sadberry, and told her about the sexual assault.

28.     Plaintiff then reported that she had been sexually assaulted to the Lawrence police and to KU's security on October 19, 2015.

29.     Later that same day, Plaintiff learned that another female student, Daisy Tackett, had been sexually assaulted by this same football player.

30.     That same day, Plaintiff also reported the sexual assault to Kyle Martinez, the athletic trainer for the rowing team, who informed the KU Team physician and also referred her to another physician for an exam. Martinez told Plaintiff she would also inform Phil Lowcock, who coordinates Student-Athlete Support for the Rowing team.

31.     Plaintiff provided details of her sexual assault to KU's Institutional Opportunity & Access ("IOA") office on October 27, 2015. Plaintiff met with the IOA investigator.

32.     Plaintiff told the KU athletic trainer that she had to miss some practices to see the doctor and participate in the IOA meeting, and she was excused from practice on those days by the trainer.

33.     In October 2015, the football player assailant sent a "snapchat" to Plaintiff after she reported her sexual assault to KU in an attempt to intimidate her.

34.     Plaintiff immediately reported the football player's message to KU Title IX officials and police.

35.     KU administrators also knew that the same football player had twice tried to intimidate Daisy Tackett on campus after she reported his conduct.

36.     On November 2, 2015, upon information and belief, the entire rowing team was required to attend a sexual assault education meeting because school administrators and the rowing team coaches knew about plaintiff and Tackett's reports, and administrators had ordered them to approach the problem as if it were the rowers' fault.

37.     During the remainder of the school year, Plaintiff made a valiant effort to a have a normal college experience, but she avoided "Late night at the Phog" and no longer went to football games or other sporting events for fear of seeing her assailant. Plaintiff became hyper-vigilant on campus and worried about her safety, propping a chair against her dorm bedroom door at night and staying in hotels off-campus.

38.     Plaintiff often feels anxious and nervous around the athletes, is easily tearful, sometimes paralyzed with fear and infuriated with anger. She has experienced flashbacks of the sexual assault.

39.     The head coach of the KU rowing team was and remains Rob Catloth, and the assistant coach was Carrie Callen.

40.     Plaintiff has a medical condition that prevents her from participating in high impact training from time to time.

41.     Instead of addressing or accommodating her specific limitations, Coach Catloth decided Plaintiff had a heart condition and that she needed physical therapy on her ankle even though there is nothing wrong with her heart, even though there is nothing structurally wrong with her ankle, and even though her position on the rowing team does not require strenuous physical exertion nor use of her legs.

42.     Coach Catloth made ongoing discriminatory remarks about some of the rowers and comments about the weight of the female athletes, calling some of the women "fat" and expressing preferences for women who conformed with more traditional gender norms for the female body.

43.     Numerous rowers reported Coach Catloth's conduct to KU's Senior Woman Administrator Debbie Van Saun, whose responsibility includes overseeing Title IX compliance and gender equity principles.

44.     In early October of 2015, many of the KU rowing team members met with Sherice Sadberry, a KU sports psychologist to discuss their concerns about Coach Catloth and his relentless commentary about their body shapes.

45.     At this meeting, rowing team members discussed fairness to players, discriminatory comments, and comments about players' weight, as well as concerns

that their reports to KU administrator Van Saun regarding Coach Catloth's conduct and ongoing commentary about their appearance were ignored and not investigated.

46.     The next week, following a competition, Coach Catloth, Assistant Coach Callen, Van Saun, and the rowing team assistant coach told everyone on the team who participated in the team meeting about Coach Catloth to remain and inform them of their complaints, in a clear act of intimidation.

47.     Many members of the rowing team repeated what they had discussed at the prior meeting, including Coach Catloth's comments and Van Saun's indifference to their reports.

48.     In late November or early December 2015, at a meeting with the coaching staff which was intended inform Plaintiff about how she was doing on the team, Coach Carrie asked Plaintiff "is KU still the place for you?"

49.     In December 2015, Coach Catloth informed Plaintiff that he would not allow her to attend an annual training trip to Florida later that month because of her training attendance.

50.     Shortly thereafter, the KU rowing coaches published the list of who is going on the training trip, and the Plaintiff was not on the list, although at least one other rowing team member, who had missed more days of practice due to surgery and medical issues, was on the list and allowed to go on the training trip in December.

51.     During the winter break from college, Plaintiff had her tonsils out and received treatment for her ankle with the intent of making her more healthy and dependable for the rowing team.

52.     After winter break, Plaintiff returned to KU for the next semester in January of 2016, and KU still had not suspended or expelled John Doe G or concluded its investigation into Plaintiff's report.

53.     In January 2016, Plaintiff provided a note from her doctor note which requested an accommodation to her training regimen and addressed the types of workouts she should and should not do to keep her healthy.

54.     On January 21, 2016, Plaintiff was required to be tested for drugs.

55.     On or around February 1, 2016, Coach Catloth made inappropriate and insulting comments about her voice as a member of the rowing team.

56.     In late January or February 2016, Coach Rob Catloth and the KU Team Physician without medical evidence or justification began the process of medically disqualifying Plaintiff from participating in collegiate sports.

57.     Coach Catloth told Plaintiff that she was "unique with your health."

58.     In early February 2016, Plaintiff arranged a meeting between her personal physician, her coaches and the KU Team physician to explain her medical condition and answer any questions or concerns that KU had about her ability to participate and compete for the team.

59.     At the meeting on February 10, 2016, the KU Physician told Plaintiff that she was a "liability" and that he knew of five other athletes who had the same

medical condition as Plaintiff and that these others did not need an accommodation for training or work-outs.

60.     Plaintiff requested accommodations for her training and work-outs as well as extensions for homework accommodations in January and February 2016.

61.     Coach Catloth failed to accommodate Plaintiff or enter into a reasonable interactive process with Plaintiff with the intent of keeping her on the rowing team at KU.

62.     During the time period of January through mid-March, 2016, the IOA office at KU kept extending the time for the investigation, and the football player's continued presence on campus created a hostile educational environment for plaintiff and Daisy Tackett.

63.     On February 11, 2016, Plaintiff requested a full release from the team without any restrictions from KU.

64.     On February 16, 2016, Plaintiff withdrew from the rowing team at KU.

65.     On February 17, KU cancelled Plaintiff's athletic grant effective after the 2016 spring semester.

66.     KU had an official policy of placing KU athletes, in particular KU football players, in KU's Jayhawker Towers Apartments, where they would receive less supervision than other residence hall options.

67.     KU knew that sexual assaults were occurring at a higher rate in Jayhawker Towers.

68.     KU failed to provide adequate supervision, warnings, training, guidance and education to its athletes and KU football players in particular at Jayhawker Towers.

69.     The likelihood of such misconduct was so obvious that KU's failure to supervise amounted to deliberate indifference to the rights of Jane Doe 7.

70.     In March of 2016, more than four months after her report, KU informed Jane Doe 7 that John Doe G had agreed to leave school.

71.     Plaintiff left KU early and completed her finals from home, never to return to KU again.

72.     Prior to leaving, but after Catloth forced her off the women's rowing team, Plaintiff successfully competed as coxswain for the men's rowing team.

73.     KU officials had actual knowledge that, prior to October 2015, KU medical staff had attempted to implement a policy requiring Coach Catloth to refer female rowing teams members to a nutritionist if he viewed their weight as a performance issue, instead of calling them "fat" or making other such comments.

74.     KU officials had actual knowledge that Coach Catloth was not abiding by the policy.

75.     KU officials, including Debbie Van Saun, deliberately chose not to make Coach Catloth comply with the policy.

76.     Van Saun also deliberately refused to investigate any of the many reports concerning Coach Catloth's comments about women that she had received in 2014 and 2015.

77.    Coach Catloth learned by October, 2015, or earlier, that plaintiff had been sexually assaulted and was participating in a Title IX investigation, having learned of the account from KU administrators, other rowers and coaches on the team.

78.    KU's rowing team coaches were award of plaintiff's anxiety and the demands of the IOA investigation upon her time and emotional state, and that another rower, Daisy Tackett, was in the same situation.

79.    KU's rowing team coaches also left Daisy Tackett off the list of women who could attend the training trip.

80.    KU's administrators treated Daisy Tackett in substantially similar fashion as they treated plaintiff.

81.    KU's interim director of IOA, Joshua Jones, was aware that Catloth had left Daisy Tackett and plaintiff off the list.

82.    KU administrators whose duty it was to investigate and enforce Title IX compliance had actual knowledge and indeed condoned Coach Catloth's decisions to not let Plaintiff to participate on the rowing team, even though she was fully qualified to participate on the team.

83.    KU permitted John Doe G to remain on campus and to participate in the KU football practices throughout the pendency of KU's supposed investigation in Plaintiff's report.

84.    KU has an official policy that requires female rowers to attend KU football games, and to cheer and encourage the football players as they enter the field.

85.    Even two rowers like Plaintiff and Sarah McClure, who had been sexually assaulted by a KU football player, were encouraged and expected to attend and root on the KU football players under KU's policy.

86.    KU has an official policy and practice of entertaining football recruits in hotels just off campus and encouraging female KU athletes to attend parties with the recruits.

87.    Upon information and belief, Coach Catloth retaliated against Plaintiff and Sarah McClure because he did not want scrutiny drawn to his history of interactions with his female rowers.

88.    KU administrators in the athletic department and in the Title IX compliance office had actual knowledge that Catloth was retaliating against Plaintiff and Daisy Tackett, and they deliberately chose not to investigate it or stop it.

### Fraudulent Misrepresentations Discovered After September 9, 2016

89.    On March 2, 2016, KU sent Plaintiff a letter stating that they were recommending that John Doe G "be permanently expelled from the University of Kansas."

90.    On March 17, 2016, KU sent Plaintiff an email stating that John Doe G had requested to resolve the case without a hearing and that he was "willing to

effectively agree to everything we would seek in a hearing." The email stated that the proposed outcome included that "[John Doe G] would be effectively permanently expelled. He will be immediately withdrawn...." and that he "will have a transcript notation. The transcript notation would be included on transcripts sent to other schools."

91.     On March 18, 2016, KU sent Plaintiff a letter stating that they understood "that you also expressed to IOA a desire for [John Doe G] to be expelled" and to go forward with the hearing.

92.     That March 18, 2016, letter to KU further stated:

You were informed that [John Doe G] had approached the university with a request that the charges be resolved without a hearing.  You were informed that [John Doe G] was willing to be effectively permanently expelled from the university, with a transcript notation, a ban from campus for ten years, and agreement to have no contact with you. From the university's perspective, this achieved what you requested and what was possible to obtain through the formal hearing process. ... I have concluded that the outcome capable of being reached without a hearing achieves everything that would have been sought during the formal hearing and is consistent with the final recommendation from the IOA investigators.... As a result, I have determined that is appropriate to resolve this matter without a hearing."

93.     The same letter describes John Doe G's status as being "permanently separated" and "effectively permanently expelled from the University of Kansas" and that he "was withdrawn from the University effective March 17, 2016."

94.     KU engaged in a similar series of misrepresentations to the other victim of John Doe G, Daisy Tackett.

95.    On February 23, 2016, KU sent Daisy Tackett a letter stating that it had "recommended to Student Affairs that [John Doe G] be permanently expelled from the University of Kansas."

96.    On March 16, 2016, KU represented to Tackett that John Doe G would agree to an immediate expulsion to avoid a hearing: "Yes, the student would be removed and banned immediately. He would not finish the semester."

97.    On the basis of this representation of an expulsion, Daisy Tackett also consented to the proposal.

98.    On March 18, 2016, KU then sent Daisy Tackett a letter stating that "[John Doe G] has been effectively permanently expelled from the University of Kansas. He was withdrawn from the University effective March 17, 2016."

99.    The March 18, 2016 letter further stated: "A notation will be placed on Mr. [John Doe G]'s transcript."

100.    The March 18, 2016 letter further stated: "This outcome achieves everything that would have been sought during the formal hearing and the University understands that you are in agreement with the resolution."

101.    However, based upon media reports that surfaced in September of 2016, KU sent John Doe G a different letter that informed him he was being allowed to withdraw in lieu of expulsion.

102.    KU's actions facilitated John Doe G's subsequent enrollment at Indiana State University, where he joined that institution's football team along with a former KU football coach.

103.   KU concealed the fact that they were allowing John Doe G to withdraw from the University in lieu of expulsion.

104.   KU misrepresented to Plaintiff that John Doe G was being expelled.

105.   KU misrepresented to Plaintiff that John Doe G would have a transcript notation that would transmitted to other schools.

106.   KU permitted John Doe G to withdraw in lieu of expulsion while leading Plaintiff to belief he had been expelled for fear of being sued by John Doe G.

107.   KU's actions were designed to enable John Doe G to go to a new football team.

108.   KU's concealment of the actual outcome displays deliberate indifference to the rights of the Plaintiff under Title IX, by deliberately misleading her as to the punishment John Doe G actually received.

109.   The letter to the victim and the perpetrator should have been the same.

## COUNT I: TITLE IX DISCRIMINATION – HOSTILE EDUCATIONAL ENVIRONMENT

110.   Plaintiff hereby adopts and incorporates the allegations set forth in paragraphs 1 through 109 above as though fully set forth herein.

111.   Plaintiff is a member of a protected class.

112.   Plaintiff suffered sexual harassment at the hands of a KU student and football player, in a KU dorm with a long history of sexual assaults.

113.   Plaintiff also suffered discrimination and harassment on the basis of her participation in a Title IX complaint.

17

114.   KU had actual knowledge that Plaintiff had been sexually harassed, that Coach Catloth was making inappropriate comments, denying her opportunities, and that John Doe G sought to intimidate her on campus.

115.   KU was deliberately indifferent to harassment Plaintiff suffered, in that:

a. KU had a policy of placing KU athletes and football players in the Jayhawker Towers knowing that they would receive less supervision, and knowing that there was a high likelihood of sexual misconduct occurring.

b. KU failed to take reasonable steps to prevent sexual assaults from occurring at Jayhawker Towers, including failing to train employees properly on preventing, investigating and punishing sexual assaults on campus, and failing to adopt and implement simple, reasonable policies that would lessen the chance of sexual assaults occurring, harassment occurring, or retaliation from occurring.

c. KU failed to immediately issue a "no contact" order to John Doe G after receiving two independent reports of sexual assaults involving him.

d. KU failed to immediately suspend John Doe G pending the outcome of KU's investigation following two independent reports of sexual assault.

e. KU failed to ban John Doe G from campus pending the outcome of KU's investigation following two independent reports of sexual assault.

f. KU failed to conduct an expedient investigation or hold a timely hearing in order to resolve Plaintiff's report.

g. KU failed to take any action on Plaintiff's report and other KU rowing team members' reports of inappropriate comments and treatment from their rowing coach.

h. KU failed to stop John Doe G from harassing the Plaintiff after she reported his sexual assault.

i. KU failed to stop the KU rowing coach from retaliating against the Plaintiff for participating in the Title IX process.

116.   KU's conduct is prohibited by Title IX.

117.   The harassment was unwelcome, severe, pervasive and objectively offensive and deprived plaintiff to access of the educational benefits and opportunities KU offered, including:

a.  A sexual assault in a KU dormitory;

b.  Intimidation by a KU football player on campus;

c.  Refusal by KU to suspend or ban the offending KU football player from campus during the investigation;

d.  Deliberate refusal to allow her to participate in team activities;

e.  Deliberate refusal to allow her to participate in rowing activities.

118.   The harassment had the systematic effect of depriving plaintiff of access to educational benefits or opportunities.

119.   Furthermore, Defendant KU deliberately failed to supervise employees that had the means and authority to stop the harassment Plaintiff experienced.

120.    Defendant KU's corrective or preventive opportunities regarding plaintiff's report of sexual harassment and retaliation were unreasonable or inadequate.

121.    Defendant KU's indifference and resulting inaction was wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well being.

122.    As a direct and proximate result of the defendant's wrongful conduct, plaintiff has suffered and continues to suffer great pain of mind, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, missed educational opportunities and out-of-pocket costs.

123.    Plaintiff has incurred and will continue to incur necessary and reasonable expenses for medical and psychological treatment, therapy and counseling as well as other economic hardships.

124.    WHEREFORE, Plaintiff prays for an award of actual damages against Defendant in an amount in excess of $75,000, for attorneys fees together with interest and costs of suit, for disgorgement of tuition and board payments made on her behalf, for order enjoining KU from continuing to place administrative holds on her transcripts, and for such and further legal and equitable relief as is deemed just and proper.

## COUNT II: TITLE IX RETALIATION

125.    Plaintiff hereby incorporates and reasserts the allegations contained in paragraphs 1 –124.

126.   Plaintiff engaged in a protected activity under Title IX when she reported her sexual assault.

127.   Contemporaneously with her protected activity, Plaintiff suffered averse actions, including:

a.  Acts of intimidation and witness tampering.

b.  Denial of access to rowing team activities.

c.  Refusal to permit her to participate in rowing.

d.  Refusal to accommodate and/or withdrawal of previous accommodations.

128.   Plaintiff's protected activity and the adverse actions are causally connected in that:

a. Plaintiff's protected activity and KU's adverse actions occurred within days of one another.

b. The KU football player John Doe G engaged in harassment and intimidation of Plaintiff immediately after being contacted by KU regarding Plaintiff's report.

c. Coach Catloth's decision to deny her access to the team trip came shortly after Plaintiff's report of the sexual assault and the team meeting on sexual assault.

d. KU administrator Debbie Van Saun, who was a subject of the rowing team's complaints, and who failed to act on the rowing team's complaints about Coach Catloth, deliberately failed to stop John Doe G or Coach Catloth from retaliating against Plaintiff.

e. Coach Catloth's reason for not bringing Plaintiff on the team trip – her alleged attendance – is pretextual, in that at least one other athlete with more attendance issues was permitted to go.

129.   Defendant KU's administration had actual knowledge of the retaliation Plaintiff was suffering:

a. Administrators knew Plaintiff was subjected to a sexual assault on campus;

b. Administrators knew that Plaintiff's rowing coach was not permitting her to travel with the team despite her qualification to do so.

c. Administrators knew that KU had not been responding effectively to Plaintiff's and the Rowing Team's reports concerning Coach Catloth.

d. Administrators knew that Plaintiff's rowing coach was actively trying to remove her from the rowing team.

130.   Defendant KU did not adequately respond to the retaliation in that:

a. KU knew retaliation was likely following her report of sexual assault but took no proactive steps such as issuing an immediate "no contact" order or suspending John Doe G, or ban him from campus, despite having two independent reports of sexual assault involving him.

b. After receiving reports of on-campus intimidation, KU failed to suspend John Doe G, ban him from campus, or issue a "no contact" order.

c. KU failed to conduct a timely investigation or hold a hearing in a timely fashion.

d. KU failed to stop Coach Catloth from denying her access to the team training event in Florida.

e. KU denied her access to the education and safe housing it promised her.

f. KU failed to stop its rowing coach from forcing Plaintiff off the rowing team and deterring her participation in KU activities.

131.   An appropriate person had actual knowledge of the discrimination and harassment suffered by Plaintiff.

132.   Furthermore, Defendant KU deliberately failed to supervise employees that had the means and authority to stop the harassment Plaintiff experienced.

133.   Defendant KU's indifference and resulting inaction was deliberate, wanton, willful and with reckless disregard and neglect of Plaintiff's rights, safety and well being.

134.   As a direct and proximate result of defendant's conduct, Plaintiff has suffered and continues to suffer great pain of mind, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, missed educational opportunities and out-of-pocket costs.

135.   Plaintiff has incurred and will continue to incur necessary and reasonable expenses for medical and psychological treatment, therapy and counseling as well as other economic hardships.

136.   WHEREFORE, Plaintiff prays for an award of actual damages against Defendant in an amount in excess of $75,000, for attorneys fees together with

interest and costs of suit, for disgorgement of tuition and board payments made on her behalf, for order enjoining KU from continuing to place administrative holds on her transcripts, and for such and further legal and equitable relief as is deemed just and proper.

## COUNT III: DISABILITY DISCRIMINATION

137.  Plaintiff hereby incorporates and reasserts the allegations contained in paragraphs 1 – 109.

138.  Plaintiff has serious medical conditions that are disabilities as defined by the Rehabilitation Act of 1973, in that each of these conditions were physical or mental impairments that substantially limit Plaintiff in the major life activities of eating, running, and walking, concentrating, and thinking.

139.  Plaintiff is a disabled person within the meaning of the Rehabilitation Act and is a qualified person with a disability, in that, at all pertinent times, Plaintiff had physical or mental impairment that limits one or more major life activities, and that she was capable of performing the essential functions of her school programs and athletics with reasonable accommodation.

140.  At all pertinent times, Defendant was aware of Plaintiff's disabilities, her dietary and nutritional needs, her limitations on exercise, and their effect on her athletic and academic performance.

141.  At all pertinent times, Defendant was aware that Plaintiff had requested accommodations for her disabilities.

142.    Defendant failed to engage in an interactive process and failed to provide reasonable accommodation.

143.    Defendant discriminated against Plaintiff because of her disability when it excluded her from participation in the rowing program at KU and denied her the benefits of the rowing program and other educational programs or activities at KU.

DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury as to all triable issues.

DESIGNATION OF PLACE OF TRIAL

Plaintiff designates and requests that trial take place in Kansas City, Kan.

Respectfully submitted,

/s/Dan Curry
Sarah Brown, KS 12130
Dan Curry, KS 22750
BROWN & CURRY, LLC
406 W. 34th Street, Suite 810
Kansas City, MO 64111
(816) 756-5458
(816) 666-9596 fax
sarah@brownandcurry.com
dan@brownandcurry.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2017 the foregoing document was served by the Court's electronic filing system upon the following parties of record:

Michael C. Leitch
Megan K. Walawender
University of Kansas
245 Strong Hall
1450 Jayhawk Blvd.
Lawrence, Kansas 66045
Tel: (785) 864-3276
Fax: (785) 864-4617
mleitch@ku.edu
megan.walawender.ku.edu

ATTORNEYS FOR DEFENDANT

/s/ Dan Curry
Attorney for Plaintiff